OPINION OF THE COURT
Loras B. York, J.
Petitioner, a former probationary employee of the New York City Department of Correction, commenced this CPLR article *759 78 proceeding seeking to annul respondent’s decision to terminate her employment, be reinstated and receive back pay.
The petition is grounded in an as yet untested provision of the New York City Human Rights Law (Administrative Code of City of NY § 8-107.1) which bars employers from discriminating against victims of domestic violence. There appears to be no reported judicial decision applying or interpreting section 8-107.1.
Facts
Petitioner was hired by the New York City Department of Correction on June 1, 2000, subject to a two-year probation period. As alleged in the petition, she is the mother of two preteenage children and a victim of abuse by their father, a crack and alcohol abuser with a criminal history. In November 2000, petitioner moved out with her children and went to live with a relative in the Bronx. Things did not work out and she was ejected from that apartment on March 22, 2002. She requested vacation time to find a home and was granted leave through April 4, 2002.
On April 5, 2002, petitioner, who was still homeless, asked the Department’s Health Management Division (HMD) for further time off to continue her search for a place to live. HMD put her on immediate sick leave due to stress, confiscated her identification, and directed her to obtain a new one which reflected she was psychologically unfit to carry a firearm (see petition, exhibit A). At that same meeting, HMD demanded that petitioner provide them with an address. When petitioner told them she was homeless and lacked an address, she was told she could not work at the Department without one. Faced with that threat even after she had explained her homelessness, she gave her husband’s address.
HMD conducted a visit to petitioner at her husband’s address in April 2002. When she was not found there, they required her to appear at HMD the following day to explain her unauthorized absence from home. Informed of these events by her mother-in-law, petitioner appeared at HMD and at their request wrote a report explaining her circumstances and homelessness. Nonetheless, HMD made four subsequent visits to the husband’s residence in April and May 2002 expecting to find petitioner there. Petitioner remained homeless, sleeping variously in her car, hotels, shelters or friends’ homes. Petitioner did return to her husband’s home on April 27, 2002, and again on May 10, *760 but both times he assaulted her and she had to seek police intervention and leave again.
Petitioner finally obtained a stable residence upon her admission to a domestic violence shelter, Safe Horizon, on May 14, 2002. According to petitioner, Safe Horizon does not allow its residents to divulge their exact address to anyone who does not sign a confidentiality agreement;* so when she called HMD to apprise them of her new address, she gave them the shelter’s office address as the place to contact her. When HMD’s monitor attempted to visit petitioner at the shelter, she was told by staff that petitioner’s residence would not be disclosed unless she signed a confidentiality agreement (see Vasquez affidavit), which she did not do.
The day after that visit, May 22, 2002, petitioner went to the hospital for surgery and returned to the shelter on May 25, having been told by her doctor to stay out of work for six weeks due to the surgery. HMD approved the leave and scheduled petitioner to return to work on July 3, 2002. After another abortive visit on June 3, HMD signed the Safe Horizon confidentiality agreement on June 7, 2002 (petitioner’s exhibit F), at which time petitioner was told to return to HMD on June 21. It is unclear whether any further visits to the shelter were made after that point.
On June 21, 2002, petitioner went to her appointment at HMD. She was given a termination letter backdated to June 17, 2002 without explanation, and her shield and identification were taken. Pursuing an unemployment claim, petitioner learned she was fired for being away from her residence while on sick leave on June 3, 2002.
Petitioner contends that her termination was illegal because it was solely based on the fact that, as a victim of domestic violence, she was unreachable while on sick leave due to HMD’s failure to sign the confidentiality agreement prior to the June 3 visit. Respondents’ position is that petitioner was a probationary employee and as such was dismissible without cause, and at any rate cause existed even without the sick leave violations.
*761 The Sick Leave Policy
The policy at issue here is the Department’s sick leave policy for members of the uniformed correction force (directive No. 2262, petitioner’s exhibit B, sick leave policy), which requires employees who report sick to furnish their “[Residence address, floor and/or apartment number, city or town, zip code, cross street, and telephone number” (§ II [2]). If reporting sick from somewhere other than their own residence, the same information must be provided for the location from where the employee is reporting sick (§ II [3]).
The sick leave policy requires all employees who are on sick leave to remain in their “residence or place of confinement” at all times except when receiving medical treatment, obtaining prescribed medicines or “where contractually permitted” (§ VII
[A] ). In addition, HMD may grant “[t]ime out of residence . . . for therapeutically beneficial reasons” (§ VII [D]). HMD may also schedule appointments for a variety of reasons. If an appointment is missed, the person on sick leave must contact HMD’s scheduling unit within one hour of the missed appointment to reschedule it (§ X [A]). Whenever the employee is to be absent from the place of confinement, the employee must advise HMD of all particulars upon both departure and return (§ VII [B] ).
Feigning illness to evade work is forbidden (§ XI [A]), and if suspected must be investigated and reported by institution or division heads (§ XI [B]). Noncompliance with the policy may result in “disciplinary charges or payroll deductions, depending upon the circumstances” (§ XI [C]).
Although under the sick leave policy only institution or division heads bear the responsibility for investigating suspected sick leave abuse (§ XI [B]), and HMD is specifically granted only the power to dispatch medical professionals to the employee’s home to evaluate his medical condition (§ I [iv]), it appears to be HMD’s practice to itself police sick leave abuse by sending monitors to a sick person’s home for surprise visits.
Public Policy Considerations
Domestic violence, often fueled by alcohol and drugs, is a blight on the American family — and society at large. Its victims come from all walks of life. The one thing they have in common is the experience of living in fear every day, for themselves and frequently their children. The combination of constant danger, fruitless vigilance, exposure to another’s rage, physical and psy *762 chic injury and pain, and inability to infuse sanity into reality— all without surcease because it generally happens in one’s own home, the one place that should be safe and sacrosanct — is at best crippling and at worst lethal. It is well established that the only sure solution is for the victim to escape the abuser.
Government entities at all levels are finally beginning to address the problem. There is now a National Domestic Violence Hotline (800-799-SAFE). The Social Security Administration, recognizing that a victim must sometimes even change identity to attain a safe environment, has established a procedure to issue new Social Security numbers to victims of domestic violence and mounted a public awareness campaign stressing the importance of victims developing safety plans. At the state and municipal levels, various legislation has been enacted to protect domestic abuse victims and ease their transition to safety.
As of July 1999, 25 states had laws prohibiting employers from discriminating against crime victims who take time off to testify in criminal proceedings. New York’s version of such law (Penal Law § 215.14) also encompasses Family Court proceedings and protects victims of domestic abuse who take time off to seek orders of protection. New York State also created an Office for the Prevention of Domestic Violence to develop model policies addressing workplace problems related to domestic violence (Executive Law § 575 [7]).
Even New York’s judiciary has also joined the bandwagon. Formerly, the plight of victims of domestic abuse was generally addressed by the courts of this state in three disjointed contexts: Family Court proceedings, criminal actions and matrimoniáis. In a recent initiative, the Chief Judge of this state established special integrated domestic violence courts, manned by specially trained personnel, with the explicit mission “to promote justice and protect the rights of all litigants while providing a comprehensive approach to case resolution, increasing offender accountability, ensuring victim safety, integrating the delivery of social services, and eliminating inconsistent and conflicting judicial orders” (Integrated Domestic Violence Courts, Mission Statement, cached at <http://www.courts.state.ny.us/reporter/ webdocs/Integrated_Domestic_Violence_Courts.htm>). Following the example set by our Chief Judge, New York State courts are in general becoming more aware and sensitive to domestic violence issues. Indeed, the Court of Appeals removed a town and village justice from office because of his insensitivity to victims of domestic violence (Matter of Romano, 93 NY2d 161 [1999]).
*763 The impact of domestic violence in the workplace has received increased attention in recent years (see e.g., Maness and Bartlett, Corporate Counsel, Domestic Violence Comes to Work, Policies Help Employers Confront Safety and Economic Considerations, NYLJ, May 14, 2001, at S1, col 1; White, Kinczkowski, Speelman and Olijnyk, Is Domestic Violence About to Spill into Your Client’s Workplace?, 81 Mich BJ 28 [Oct. 2002]; Corcoran, Domestic Violence in the Workplace: Ensuring a Safe Environment for All, 7 [No. 5] Empl L Strategist 1 [Sept. 1999]). Lethal results have ensued from employers’ deaf ears to a victim’s pleas for time off work (e.g., Carroll v Shoney’s, Inc., 775 So 2d 753 [Ala 2000]) or for protection from the abuser (e.g., La Rose v State Mut. Life Assur. Co., 215th Dist Ct, Harris County, Tex, No. 93226841994).
The ability to hold on to a job is one of a victim’s most valuable weapons in the war for survival, since gainful employment is the key to independence from the batterer.
“A batterer causing the victim’s job loss can incite financial despair when the victim realizes that she cannot provide for herself or her children without the batterer’s assistance . . . Moreover, with each firing it becomes more difficult for victims to obtain new jobs. They are labeled as problematic employees while no effort is made to hold the abusers responsible” (Buel, Effective Assistance of Counsel for Battered Women Defendants: A Normative Construct, 26 Harv Women’s LJ 217, 245 [spring 2003]; see e.g., Gregg v Anchorage, Alaska Super Ct, No. 3AN-98-10263-CI, Mar. 15, 2002).
Neither is the domestic violence victim’s employer in for a picnic. “Domestic violence leads to absenteeism, increased health care costs, higher turnover, lower productivity, and a greater risk that a violent incident will occur at [the] workplace” (Domestic Violence — Not Just a Problem in the Home, Cal Emp L Letter, Mar. 19, 2001), especially when law prohibits discrimination for lost time. Hence, it is of mutual advantage to work together to end the threat of violence.
In 2000, California amended California Labor Code § 230 to bar employment discrimination against victims of domestic violence who took time off to obtain judicial relief. In 2001, that protection was expanded to encompass time off to seek medical attention or psychological counseling for domestic violence related injuries. Under California law (Cal Labor Code §§ 230, 230.1),
*764 “[ejmployers are required to maintain employee confidentiality for leave taken under the law, and employees may use vacation, personal leave or compensatory time off that is otherwise available to them. However, the law does not create employee rights to take unpaid leave in excess of the time allowed under the federal Family and Medical Leave Act of 1993” (California Prohibits Adverse Employment Action Against Sexual Assault Victims, Private Educ L Rep [Dec. 2002]).
Rhode Island (RI Gen Laws § 12-28-10 [a]) bars employment discrimination by employers, employment agencies and licensing agencies against those who seek or refuse to seek a protective order under Rhode Island General Laws, title 15, chapter 15 or title 8, chapter 8.1. In 2001, Tennessee’s General Assembly introduced bills which would (1) make it discriminatory for an employer to fire or not hire victims of domestic violence; (2) prohibit denying unemployment benefits because of circumstances stemming from domestic abuse, and require that unemployment compensation be provided when an employee loses a job due to domestic abuse; and (3) allow employers of domestic violence victims threatened at the workplace to seek a TRO and injunction protecting workplace and the domestic violence victim while at the workplace.
The law at issue here, New York City Administrative Code § 8-107.1, is one such initiative.
Applicable Law
In 2001, based on the foregoing public policy considerations, the New York City Council enacted an amendment to the City’s Human Rights Law to prevent employers from discriminating against victims of domestic violence (Administrative Code § 8-107.1). The stated purpose of this amendment was “to protect the economic viability of victims of domestic violence and to support their efforts to gain independence from their abusers” by “enabling] victims of domestic violence to speak with their employers without fear of reprisal, about a domestic violence incident or about possible steps that will enhance their ability to perform their job without causing undue hardship to the employer” (Local Law No. 1 [2001] of City of NY § 1).
The section relied on by petitioner provides that
“[i]t shall be an unlawful discriminatory practice for an employer, or an agent thereof, to refuse to *765 hire or employ or to bar or to discharge from employment, or to discriminate against an individual in compensation or other terms, conditions, or privileges of employment because of the actual or perceived status of said individual as a victim of domestic violence” (Administrative Code § 8-107.1 [2]).
Analysis
“A probationary employee can be dismissed ‘without a hearing and without a statement of reasons in the absence of any demonstration that dismissal was for a constitutionally impermissible purpose or in violation of statutory or decisional law.’ . . . Judicial review of such a determination ‘is limited to an inquiry as to whether the termination was made in bad faith.’ . . . The burden of raising and proving such ‘bad faith’ is on the employee and the mere assertion of ‘bad faith’ without the presentation of evidence demonstrating it does not satisfy the employee’s burden” (Matter of Soto v Koehler, 171 AD2d 567, 568 [1st Dept 1991]; see also Matter of Talamo v Murphy, 38 NY2d 637, 639 [1976]).
Where bad faith is alleged, the scope of judicial review is broader (Matter of Johnson v Katz, 68 NY2d 649, 650 [1986]).
“The broad discretion enjoyed by those who are empowered to discharge probationary employees is not unbridled, but is, as a matter of law and public policy, contingent upon good faith” (Kroboth v Sexton, 160 AD2d 126, 127 [1st Dept 1990]). “We take as an axiom that the burden of raising and proving bad faith rests upon petitioner’s shoulders” (id. at 130). Nonetheless, the Administrative Code imposes on the employer “the burden of proving undue hardship” to its business whenever it refuses to reasonably accommodate the special needs of a domestic violence victim (Administrative Code § 8-102 [18]).
It is clear that petitioner falls under the statutory definition of a “victim of domestic violence” (Administrative Code § 8-107.1 [1] [b]). The dispositive issue is whether the Department’s sick leave policy — or its implementation with respect to petitioner and those similarly situated — is impermissibly discriminatory (Administrative Code § 8-107.1 [2]).
Respondents have produced evidence that petitioner’s job performance, especially in the first year, was not exemplary. She had excessive tardiness and absenteeism (perhaps a by-product of the domestic violence) and had an altercation with a coworker. *766 Clearly, had they chosen to fire her at that point, they would have been totally within their rights. However, they did not do so. They kept her on and it was only when she was living in a shelter for abused women with an apparent unverifiable address that they terminated her employment. “Although, in an appropriate case, [protected status]-related chronic absenteeism may be found to prevent an employee from reasonably performing the duties of the job, the inquiry must focus on petitioner’s status as of the time of actual termination and not earlier” (Matter of McEniry v Landi, 84 NY2d 554, 560 [1994]).
Respondents may not have intentionally acted in bad faith, as petitioner contends, but they did act in contravention of Local Law No. 1 in that they failed to make reasonable accommodations for petitioner’s status as a homeless victim of domestic violence. The end result here, petitioner’s loss of a job at the point when she was finally getting her living situation under control, is exactly the kind of fallout that Local Law No. 1 was enacted to prevent. “Fortunately, the law recognizes that the forms and guises of discriminatory conduct do not always fall neatly into readily identifiable packages and affords relief so long as the victim can establish that the conduct occurred ‘under circumstances which give rise to an inference of unlawful discrimination’ ” (cf. Sogg v American Airlines, 193 AD2d 153, 162 [1993]).
Accordingly, it is ordered and adjudged that the petition is granted to the extent that respondents’ determination to terminate petitioner’s employment based on her being unavailable when HMD’s monitors visited her is hereby vacated and the matter is remanded to respondents for reinstatement and back pay in accordance with this decision.

 The written policy submitted by petitioner (exhibit F) is not addressed to Safe Horizon residents, but rather to its interns and volunteers, and is not as clear-cut as petitioner represents. However, the need for the confidentiality agreement is confirmed by the affidavit of Anne Marie Vasquez, a Safe Horizon supervisor.