OPINION OP THE COURT
Doris Ling-Cohan, J.
It is ordered that this CPLR article 78 petition is granted to the extent indicated below.
Petitioner, a victim of domestic violence and caregiver to five children, three of whom have special needs, commenced this article 78 proceeding to annul respondents’ determination to terminate her employment as a probationary correction officer.
Background
Petitioner was hired as a correction officer by the New York City Department of Correction (Department of Correction or Correction) on December 16, 2010, for a two-year probationary period. In recognition of her exemplary performance as a correction officer, petitioner was awarded a letter of appreciation on May 6, 2011 (verified petition, exhibit B), and a certificate of appreciation on August 7, 2011 (verified petition, exhibit C). Petitioner was also recognized by the local press for saving a man’s life, appearing in a news article published on February 27, 2011, which featured a photograph of petitioner in her correction officer uniform. (Verified petition, exhibit A [NY Daily News article (Feb. 27, 2011)].)
However, on February 8, 2012, petitioner was placed in “chronic absence” status, based on 63 sick days between September 13, 2011 and February 5, 2012. Petitioner states, and respondents do not dispute, that such absences were due to two surgical procedures on the fourth finger of her left hand, following an injury petitioner sustained when a kitchen cabinet fell on her hand. Nevertheless, despite petitioner’s undisputed medical documentation, respondents placed petitioner in a “chronic absence” category, based on these 63 absences, which subjected her to additional monitoring by her employer.
After being placed in “chronic absence” status, petitioner alleges that her absences between February 2012 and the date of her termination, August 22, 2012, were primarily the result of her being a victim of domestic violence. It is undisputed that *777 petitioner visited Department of Correction’s Health Management Division (HMD) on a number of occasions. Petitioner indicated that she disclosed her physical and mental abuse on a number of occasions to HMD and other times, as explained further below. Petitioner details such abuse in her petition, describing incidents in which her abuser: wrapped his hands around petitioner’s throat and strangled her (verified petition at 4, 13); punched a door, causing the door to break (id.); deliberately hid her badge so that she could not go to work (id.); held a beer bottle in his hand while threatening, “so you want me to smash your face with this bottle” (id. at 5, I 25); became enraged when petitioner had her friends visit their home, threatening, “I’ll get a gun and kill you and all your friends,” and “I don’t want these bitches up in here” (id. at 4, f 14); yelled at her during an argument at home, threatening, “I’ll fuck you up,” and “I just want to punch you in the face,” then punched a hole in the wall (id. at 4-5, 1 19); screamed into petitioner’s face, stating, “you want me to break your fucking face,” and “I’ll fuck you up and then I’ll fuck him up too [referring to petitioner’s nephew]” (id. at 6, f 29); and threatened, almost daily, to “fuck up” petitioner (id.).
Petitioner further maintains that her abuser’s increasingly volatile behavior caused her to be afraid of leaving her five children alone with him at night while she was at work. (Verified petition at 4, f 15.) Petitioner cares for five children (including three of her own children and two of her grandchildren). A number of the children have special needs and require monitoring at night. As indicated, in March 2012 petitioner’s abuser wrapped his hands around petitioner’s throat and strangled her. His volatile behavior was evidenced in ways including punching a door, causing the door to break. (Id. at 4, ft 13.) With her abuser becoming increasingly out of control, petitioner feared leaving the children with him alone at night, especially given that a number of them have special needs. Specifically, petitioner’s twin grandchildren have sleeping disorders requiring monitoring at night, as the disorders often cause them to bang their heads on the bed. (Id. at 4, f 15.) To address this and other problems with working a midnight schedule, petitioner applied to the Department of Correction on April 10, 2012, for a “hardship tour,” in which she requested to be switched from a midnight tour of duty (11:00 p.m. to 7:00 a.m.), to either a 7:00 a.m. to 3:00 p.m. or an 11:00 a.m. to 7:00 p.m. tour, on the basis of personal hardship. She supported her *778 request with documentation from a staff therapist assigned to her son, J., and from the ongoing service coordinator assigned to the twins. {Id. at 4, f 16; exhibit F [request for hardship tour].) The Department of Correction denied petitioner’s request, which led to increased absences on account of petitioner not being able to leave the children in her abuser’s hands. (Verified petition at 4, f 17.)
On or about April 10, 2012, petitioner advised respondent Correction’s agent Dr. Mathur from HMD, that her abuser had pushed her and hurt her back. {Id. at 5, M 21-22.) Dr. Mathur referred her to a neurologist and temporarily assigned her to light duty. {Id.; exhibit G [HMD disposition].) Petitioner alleges that on a number of occasions she requested accommodations to address her situation, albeit, initially, she provided the children’s needs as an excuse as, at first, she did not want to disclose that she was a victim of domestic violence. Nonetheless, as further explained below, respondents’ own records indicate that petitioner suffered from physical and mental abuse.
On or about April 23, 2012, petitioner again disclosed her physical and mental abuse to respondents and a psychological evaluation was conducted by a member of respondents’ medical staff of HMD, Dr. Faouzia Barouche, who found petitioner to be psychologically not qualified to carry or possess a firearm. (Verified answer, exhibit 17 [patient’s progress notes] at 6; see also exhibit 18 [fitness to possess/carry firearm].) Although not reflected in Dr. Barouche’s notes, petitioner contends, and respondents do not dispute, that such disqualification was an automatic result of her reporting her domestic violence situation. (Reply affirmation of petitioner at 5, 1 16.) At the same time, after the disclosure of abuse to Dr. Barouche, petitioner was referred by Dr. Barouche to consult with the Correction Assistance Response for Employees (CARE), a Department of Correction unit that provides counseling and social services to its employees. It does not appear that petitioner was referred to respondents’ Equal Employment Opportunity (EEO) Office for assistance with her domestic violence crisis. Thereafter, petitioner endeavored to contact CARE on numerous occasions and left many unreturned messages. When CARE finally contacted petitioner, she was advised to seek an order of protection.
Petitioner states that Ms. Doreen Medford, the social worker from CARE, told her that she would inform petitioner’s command about her status as a victim of domestic violence, and *779 that Ms. Medford specifically told petitioner that she would contact Administrative Deputy Warden Diaz. (Reply aff of petitioner, exhibit A, f 8; verified petition at 7, M 31-32.) This has not been disputed by respondents as an affidavit from Ms. Medford, or Warden Diaz, have not been supplied.
Petitioner also sought help from Safe Horizon, a victim assistance agency that provides support to victims of domestic violence and their families. Although respondents baldly deny (unsupported by an affidavit) that they had any record of communication from Safe Horizon, petitioner maintains that she personally delivered a letter from Safe Horizon (dated May 16, 2012), which included a copy of the temporary order of protection and summons for the next court date, in which respondents were specifically notified that petitioner was receiving counseling services as a victim of domestic violence, that it was of crucial importance for petitioner to appear at the next Family Court date on May 21, 2012, and that she was granted an exclusionary order of protection against her abuser by the Family Court. Petitioner specifically states in her sworn affidavit that she personally delivered the documents to Correction Officer Quinones for delivery “To Warden Agro (through channels)” (reply aff of petitioner, exhibit A, ‘JIl 3, 5), which has not been refuted by anyone with personal knowledge. In fact, petitioner confirmed receipt in that she states that shortly thereafter, she was advised by Correction Officer Perez, secretary to Administrative Deputy Warden Diaz, that Warden Diaz had received her delivery notifying her employer of Safe Horizon’s domestic violence assistance and the upcoming crucial Family Court date. (Id. f 7.) This has not been specifically refuted by respondents or by anyone with personal knowledge. Significantly, given that no affidavit has been submitted by Correction Officer Quinones, Correction Officer Perez, or Warden Diaz, disputing receipt of petitioner’s packet notifying her employer that she was a victim of abuse and the crucial Family Court date. (Id.)
The family offense petition, undisputably received by respondents, in addition to further detailing the abuse, specifically notified respondents that her abuser: “knows that I am on a probationary period at work and that reporting the [abuser] would impact my employment. The [abuser] frequently hides my badge so that I have to call out of work.” (Verified petition, exhibit K [family offense petition] at 2, ][ 3.) Thus, according to petitioner, respondents were on notice not only of the abuse, but her reasons for calling out of work and being absent.
*780 Despite notification that petitioner was a victim of domestic violence and had to appear in Family Court, it is undisputed that respondents marked petitioner as AWOL (absent without leave) on petitioner’s mandatory Family Court appearance date on her order of protection, May 21, 2012. Petitioner maintains that she requested assistance from respondents’ agent HMD since the initial order of protection temporarily barred her abuser from the home, leaving her with no childcare, and the NYC Administration for Children’s Services was now involved in monitoring her home, so she could not leave her children unattended. Specifically, she requested a leave of absence as a “reasonable accommodation,” which was denied by respondents because she was a “probationary” employee. There is proof in the record before the court that petitioner pleaded with HMD not to ignore her issues (verified petition ff 34, 35, 38, 43). Thus, she maintains that her absenteeism was a by-product of the domestic violence she experienced. Shortly thereafter, on August 22, 2012, petitioner was terminated.
Petitioner commenced this article 78 proceeding seeking a judgment annulling her termination and ordering that she be reinstated with back pay and benefits. Petitioner contends that respondents terminated her employment in violation of New York City Human Rights Law (HRL) (Administrative Code of City of NY) §§ 8-107 (1) (a) and 8-107.1 (2), discriminating against her as she was a victim of domestic violence and suffered a temporary disability.
Petitioner asserts that not only did respondents fail to provide any reasonable accommodation for her as required given her status as an alleged victim of domestic violence, but, rather, punished her by charging her with AWOL violations that had no substance or merit, or were not within her control, including one instance when petitioner was classified as AWOL, despite notice of her mandatory domestic violence-related court appearance. Petitioner further contends (as explained below) that, to the extent that respondents have used her absences resulting from her temporary disability and surgeries, as a basis for termination, such action violated Administrative Code § 8-107 (1) (a), which bars discrimination based on disability.
In opposition, respondents argue that their determination to terminate petitioner’s employment as of August 22, 2012, was not arbitrary and capricious, and that petitioner, as a probationary correction officer, could be terminated at any time, with or without cause. Respondents further argue that petitioner’s *781 termination was not related to her status as a domestic violence victim. Although respondents do not disclaim all knowledge of her domestic violence issues, they claim to have “limited” knowledge about the circumstances of any alleged violence in petitioner’s household (notwithstanding their attachment of records to the answer which reveal respondents’ knowledge of her domestic violence status [see e.g. respondents’ exhibit 17 at 5-6; respondents’ brief at 9]), and that, what “limited” disclosures petitioner made regarding any alleged abuse, were made “in confidence” during the course of medical treatment and counseling, and would not have been disseminated to the management personnel who ultimately made the decision to terminate petitioner. Notably, despite claims of confidentiality, respondents attach petitioner’s medical records which reflect disclosures of her domestic violence status. Instead, respondents assert that petitioner was terminated for legitimate nondiscriminatory reasons, including significant attendance problems, as well as repeated violations of departmental policy and procedure, which supposedly existed before any domestic abuse was alleged by petitioner. Significantly, however, respondents do not claim they had terminated petitioner, or made the decision to terminate her, prior to the period in which petitioner is alleged to have disclosed her domestic abuse to her employer.[1] Nor do they claim to have rested their decision to terminate on any one single absence or infraction, but, rather, indicate that they based their decision on the totality of the absenteeism and such infractions.
Notably, respondents fail to argue or provide any evidence showing that reasonable accommodations to the multiple requests made by petitioner, a victim of domestic abuse, as per Administrative Code § 8-102 (18), could not be provided because of undue hardship to respondents’ business operations. Respondents merely maintain that the written requests submitted by petitioner never mentioned domestic violence. Nor do respondents indicate that a referral was made to their EEO Office or Office of Victim Services, to assist petitioner, or that they engaged in any interactive process to assist petitioner to find a reasonable accommodation.
The court notes that respondents only submitted an answer verified by an attorney, without personal knowledge, and with *782 no supporting affidavit by someone with personal knowledge of the facts, to controvert petitioner’s detailed sworn submissions.[2] Accordingly, such facts contained in petitioner’s sworn submissions are deemed admitted, including that petitioner gave notice to respondents on several occasions that she was a domestic violence victim, that she provided notice about her mandatory Family Court date, and that she requested reasonable accommodation to address her status.
In reply, petitioner again asserts that, as a matter of law, respondent Correction has a duty to reasonably accommodate her as a victim of domestic violence under Administrative Code § 8-107.1 (3) (a), as petitioner’s status as a victim of domestic violence was known, or should have been known, by respondents. (Reply affirmation of petitioner ff 5-6.) Petitioner contends that respondents were on notice of petitioner’s status as a domestic violence victim, as indicated herein, and failed to justify how granting her the change of tour to a daytime tour, or a leave of absence, would be an “undue hardship,” as required under the law, citing Administrative Code § 8-102 (18). Petitioner argues that the petition should thus be granted.[3]
In particular, petitioner asserts that she told respondent Correction’s doctors about her status as a victim of domestic violence. Specifically, she points to respondents’ own records, in the respondents’ Health Management Division’s patient progress notes, dated April 30, 2012, May 5, 2012, and May 18, 2012, which confirm petitioner’s claims that respondents were on notice that she was a domestic violence victim. (Verified answer, exhibit 17; respondents’ brief at 9.) Additionally, petitioner argues that, while respondents disclaim knowledge of the May 16, 2012 letter from Safe Horizon to Warden Rose Agro (which petitioner states by sworn affidavit that she personally delivered to Correction Officer Quinones in personnel, who accepted it), respondents fail to support their denial of *783 knowledge of such communication from Safe Horizon with an affidavit, by someone with personal knowledge.[4]
Furthermore, petitioner observes that respondents do not really dispute that petitioner also disclosed the domestic violence problems she was experiencing with her abuser to Assistant Deputy Warden Saunders, in a conversation on August 13, 2012, which supports her claim that respondents knew of her status as a victim of domestic violence. Petitioner also argues that respondents’ statement that Warden Saunders recalled that petitioner specifically said that the argument with her significant other had “not escalated to any violence” (verified answer at 16, 84), suggests that Warden Saunders had no basis on which to conclude that petitioner was not a victim of domestic violence. Petitioner contends that respondents’ description of her conversation with Warden Saunders is, in fact, an admission, as it implies that, although the fight had not “escalated to any violence” at that time (id.), it was clearly not a simple contentious disagreement common to couples, but rather that there was a threat and potential “escalation” to violence, which Administrative Code § 8-107.1 specifically protects against, in addition to acts of physical violence. At that juncture, according to petitioner, she had made numerous disclosures to HMD (reflected in respondents’ exhibit 17),[5] and had delivered Safe Horizon’s letter of notification including the Family Court petition, detailing numerous counts of abuse and reasons for her absence. Additionally, petitioner maintains that respondents’ mere conclusory disclaimer of knowledge of petitioner’s status as a victim of domestic violence should be rejected, as it is unsupported by any affidavit, and, in fact, as indicated, respondents’ own records support petitioner’s asser *784 tions that respondents were well aware of her domestic violence status.[6]
Petitioner further argues that additional indicia call into question respondents’ denial that they were aware of petitioner’s status as a victim of domestic violence. In particular, petitioner points to respondents’ admission in the verified answer, which petitioner claims shows that, as early as May 1, 2012, respondents had knowledge that petitioner had met with CARE, a unit within the Department of Correction, that provides counseling and social services to its employees. Significantly, petitioner asserts that, pursuant to respondents’ own written domestic violence policy (see verified answer, exhibit 21 [NY City Department of Correction Directive No. 6301 § VI-B]), respondent Correction is required to refer any employee known to be a victim of domestic violence to CARE for assistance, and that such referral is typically accompanied by the loss of firearm privileges. It is argued that this is precisely what occurred here, as petitioner was deemed psychologically unfit to carry a firearm on April 30, 2012, which coincided with her referral for domestic violence, to CARE on April 23, 2012. Notably, while respondents point out that Dr. Barouche[7] did not specifically indicate “domestic violence” in her notes on April 30, 2012, when she deemed petitioner psychologically unfit, Dr. Barouche, nor respondents, have provided an alternative reason for petitioner’s loss of firearm privileges; this supports petitioner’s claim that she did in fact advise the doctor of her domestic violence situation or, otherwise, Dr. Barouche would have indicated another reason on the form. (Verified answer at 18, f 92; exhibit 18 [fitness to possess/carry firearm].) Significantly, Dr. Barouche’s notations appear just below several comments written on the same day and on the same page, detailing petitioner’s domestic violence situation by the doctor’s nurse, Abigail Petersen, RN.
Moreover, petitioner observes that respondent Correction does not deny that petitioner had contact with Ms. Doreen Medford, the social worker from the respondents’ CARE Unit, who, according to petitioner, told her that she would notify petitioner’s command that petitioner was dealing with domestic violence issues, which she was entitled to rely on, given that she was referred to CARE for assistance with her domes *785 tic violence problem. Petitioner maintains that respondents’ mere unsupported and conclusory denials further calls into doubt their disclaimer of lack of knowledge of petitioner’s status as a victim of domestic violence, thereby demonstrating that their alleged reasons for terminating her were not made in good faith and were a pretext for discrimination. Notably, no affidavit refuting petitioner’s claims has been submitted by Ms. Medford on behalf of respondents.
Additionally, in response to respondents’ claim that they had, at best, “limited” knowledge regarding the circumstances of any alleged violence in petitioner’s household, and that any limited disclosures made by petitioner in confidence during the course of medical treatment and counseling would not have been disseminated to the management personnel who ultimately made the decision to terminate her, petitioner maintains that Warden Saunders, who initiated a request for petitioner’s termination on July 20, 2012, must be charged with knowledge of petitioner’s status as a victim of domestic violence, as she is the Warden and Executive Officer in charge of the Department of Correction’s Health Management Division (which includes CARE and the medical team) and to which petitioner made multiple disclosures regarding her domestic violence status as reflected in respondents’ own records.[8] Accordingly, as the person in charge, she had unfettered access to all of petitioner’s records that are maintained by its doctors and nurses. Furthermore, petitioner argues that, while respondents contend that the ultimate decision to terminate her would have been the responsibility of Deputy Commissioner Finkleman, such decision to terminate would have been based on Warden Saunders’ recommendation for her termination, who had an obligation to review petitioner’s record so would have ascertained that she was a domestic violence victim.[9] Thus, respondents cannot evade responsibility by merely claiming that Deputy Commissioner Finkleman had no knowledge of petitioner’s status as a victim of domestic violence as Warden Saunders was in charge of, and had access to petitioner’s records containing the multiple disclosures,[10] and was part of his management team, making the decision to terminate. The court again notes that respondents failed to submit an affidavit from either War *786 den Saunders or Deputy Commissioner Finkleman refuting knowledge of petitioner’s domestic violence status.
Petitioner also maintains that respondents admit in their verified answer that they based the decision to terminate unlawfully, in part, on petitioner’s past disability-related absences for which she had several surgeries, and from which she ultimately fully recovered. Petitioner claims that such admission by respondents, in addition to petitioner’s status as a victim of domestic violence, were the true motivating factors for petitioner’s unlawful termination, and thus were discriminatory and violative of both Administrative Code §§ 8-107 (1) (a) (barring disability discrimination) and 8-107.1 (2) (barring discrimination against a domestic violence victim).[11]
Discussion
A. Standard of Review
The grounds for challenging an administrative determination are limited to whether the “determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed.” (CPLR 7803 [3]; see also Matter of Talamo v Murphy, 38 NY2d 637, 639 [1976] [“courts will not interfere with the discretion of the appointing officer unless the action complained of was arbitrary and capricious”].)
With respect to a probationary employee, the general rule is that such an employee:
“can be dismissed without a hearing and without a statement of reasons in the absence of any demonstration that dismissal was for a constitutionally impermissible purpose or in violation of statutory or decisional law. Judicial review of such a determination is limited to an inquiry as to whether the termination was made in bad faith. The burden of raising and proving such bad faith is on the employee and the mere assertion of bad faith without the presentation of evidence demonstrating it does not satisfy the employee’s burden.” (Matter of Soto v Koehler, 171 AD2d 567, 568 [1st Dept 1991] *787 [internal quotation marks and citations omitted].)
Nevertheless, “[t]he broad discretion enjoyed by those who are empowered to discharge probationary employees is not unbridled, but is, as a matter of law and public policy, contingent upon good faith.” (Kroboth v Sexton, 160 AD2d 126, 127 [1st Dept 1990].)
Moreover, as detailed below, the HRL applies to protect probationary employees from employment discrimination, such as discrimination against victims of domestic violence (Administrative Code § 8-107.1 [2]),[12] and disability-based discrimination (Administrative Code § 8-107 [1] [a]),[13] as alleged herein, providing an exception to the rule that a probationary employee may be terminated without a hearing and for any or no reason. (See Quick v Horn, 21 Misc 3d 1116[A], 2008 NY Slip Op 52078[U] [Sup Ct, NY County 2008] [petitioner, a probationary correction officer, may not be terminated from her employment based on her status as a victim of domestic violence under the New York City Human Rights Law, Administrative Code § 8-107.1 (2)]; Matter of Reynolds v Fraser, 5 Misc 3d 758 [Sup Ct, NY County 2004] [the termination of probationary correction officer, who was a victim of domestic violence, for violation of the employer’s sick leave policy violated the New York City Human Rights Law, Administrative Code § 8-107.1 (2)].) In fact, “[t]he State HRL provides protections broader than the ADA; and the City HRL is broader still.” (Phillips v City of *788 New York, 66 AD3d 170, 176 [1st Dept 2009] [citations omitted].)
1. Reasonable Accommodation by Employer if Discrimination
Notwithstanding that petitioner generally bears the burden of raising and proving bad faith, where discrimination is alleged, the burden shifts, as “the [New York City Human Rights Law] places the burden on the employer to show the unavailability of any safe and reasonable accommodation and to show that any proposed accommodation would place an undue hardship on its business,” whenever it refuses to provide reasonable accommodation to protected individuals. (Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 835 [2014] [emphasis supplied]; see also Romanello v Intesa Sanpaolo, S.p.A., 22 NY3d 881 [2013].) “Reasonable accommodation” is defined as “accommodation that can be made that shall not cause undue hardship in the conduct of the [employer’s] business.” (Administrative Code § 8-102 [18].) The New York City Human Rights Law specifically states that “[the employer] shall have the burden of proving undue hardship.” (Id.) It will, however, be an affirmative defense for employers if “the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job . . . .” (Administrative Code § 8-107 [15] [b].) Nevertheless, “the employer, not the employee, has the pleading obligation to prove that the employee could not, with reasonable accommodation, satisfy the essential requisites of the job.” (Romanello v Intesa Sanpaolo, 22 NY3d at 885 [internal quotation marks and citation omitted].)
An “employer is required to engage in a good faith interactive process whereby employer and employee clarify the individual needs of the employee and the business, and identify the appropriate reasonable accommodation.” (Phillips v City of New York, 66 AD3d 170, 175 [1st Dept 2009].) The “good faith interactive process is an independent element of the . . . discrimination analysis under either the State or City HRL which, if lacking, automatically compels a grant of summary judgment to employee or a verdict in the employee’s favor.” (Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 838 [2014].) Therefore, the “employer’s decision to engage in or forgo an interactive process is but one factor to be considered in deciding whether a reasonable accommodation was available for the employee’s disability at the time the employee sought accommodation.” (Id.)
*789 In fact, “a request for accommodation need not take a specific form,” so the “requests for accommodation may be in plain English, need not mention the statute, or the term ‘reasonable accommodation,’ and need not be in writing.” (Phillips v City of New York, 66 AD3d at 189 and n 24.) The HRL further “affirmatively requires that, even in the absence of a specific request, an employer ‘shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job . . . provided that the disability is known or should have been known by the [employer].’ ” (LaCourt v Shenanigans Knits, Ltd., 38 Misc 3d 1206[A], 2012 NY Slip Op 52379[U], *5 [Sup Ct, NY County 2012] [emphasis supplied], quoting Administrative Code § 8-107 [15] [a], citing Phillips, 66 AD3d at 189; see also Haight v NYU Langone Med. Ctr., 2014 WL 2933190, 2014 US Dist LEXIS 88117 [SD NY, June 27, 2014, No. 13-Civ-04993(LGS)]; Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 838 n 2 [2014] [employer required to “hold a constructive dialogue about the possibility of a reasonable accommodation”].)
2. Disability Discrimination
The New York City Human Rights Law affords protections against disability discrimination, barring employers from discriminating on the basis of a disability. (Administrative Code § 8-107 [1] [a].)[14] The term “disability” is broadly defined under the New York City Human Rights Law as “any physical, medical, mental or psychological impairment, or a history or record of such impairment.” (Administrative Code § 8-102 [16] [a].) An employer is required under the New York City Human Rights Law to “make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the [employer].” (Administrative Code § 8-107 [15] [a].) As explained above, the New York City Human Rights Law places the initial burden on the employer to prove undue hardship. (Administrative Code § 8-102 [18]; Jacobsen v New York City Health & Hosps. Corp., 22 NY3d at 835; Romanello v Intesa Sanpaolo, 22 NY3d at 885.)
3. Domestic Violence Victim Status Discrimination
In 2001, in recognition of the plight of victims of domestic violence and the corresponding impact of domestic violence in *790 the workplace, the New York City Council enacted an amendment to the New York City Human Rights Law (HRL § 8-107.1 [2])[15] to broaden the number of protected classes to include status as a victim of domestic violence, as a protected category with regard to employment. {See Local Law No. 1 [2001] of City of NY § 1.) Based on its finding “that it is in the best interests of the City of New York to protect the economic viability of victims of domestic violence and to support their efforts to gain independence from their abusers” {id.), the City Council enacted the amendment, “in order to enable victims of domestic violence to speak with their employers without fear of reprisal, about a domestic violence incident or about possible steps that will enhance their ability to perform their job without causing undue hardship to the employer” {id.).
The importance of such employment discrimination protection for victims of domestic violence is further highlighted in the legislative history of the amendment, which indicates that “studies have determined that between twenty-four and fifty-two percent of battered women surveyed had lost their jobs at least in part due to domestic violence, which included harassment by the batterers both on and off the job.” {Id.) The HRL, therefore, also requires that reasonable accommodations be provided for domestic violence victims.[16]
4. Respondents’ Domestic Violence Policies/Procedures: Department of Correction’s April 20, 2011 Directive
Attached to respondents’ answer is Correction’s Directive on Victims of Domestic Violence, effective April 20, 2011, which “establish[es] the New York City Department of Correction (Department) policies and procedures regarding victims of domestic violence.” (Respondents’ exhibit 21 at 1.) Such Directive *791 states that “[t]he Department shall provide reasonable accommodations that do not create undue hardship and that enable such persons to satisfy the essential requisites of a job, provided that the status as a victim of domestic violence ... is known, or should have been known, by the Department.” {Id. at 1.) Reasonable accommodation is defined by the Directive as
“modification or adjustments to the . . . work environment, or to the manner or circumstances under which a position is customarily performed, that promote equal employment opportunity for a victim of domestic violence . . . and enable the individual to reasonably perform the essential functions of the job or position applied for.” {Id. at 2.)
In fact, the Directive mandates an affirmative obligation, requiring that “[m]anagement, supervisors, and HMD staff shall immediately refer any employee, known to be the victim ... of domestic violence, to the EEO Office and encourage the employee to visit CARE.” {Id. at 4.)
Once the victim is referred to the EEO Office, such office “will engage in the interactive process to determine a reasonable accommodation that will allow the employee to satisfy the essential functions of the position and which does not impose an undue hardship.” {Id. at 4, 5.) As part of the “interactive process” the EEO Office “will consult with the employee to identify what documentation he/she might have, or be able to obtain, that will not compromise his/her safety-related needs and will satisfactorily meet the documentation requirements of the Department.” {Id. at 3.) In addition the “Office for Victim Services will work in collaboration with CARE to ensure the victim is provided with resources, information and support.” {Id. at 5.)
5. Disproportionate Penalty
Even where there is no showing of bad faith, a court may determine that an agency’s determination is shocking to one’s sense of fairness and disproportionate to the offense such that a lesser penalty is warranted. (See Rob Tess Rest. Corp. v New York State Liq. Auth., 49 NY2d 874, 875 [1980] [the penalty imposed was so disproportionate to the misconduct as to warrant a lesser penalty]; Matter of Harris v Mechanicville Cent. School Dist., 45 NY2d 279, 285 [1978] [petitioner’s dismissal from employment was so disproportionate to the offense as to shock the Court’s sense of fairness, necessitating remand for imposition of a lesser penalty]; Matter of Palmer v Rhea, 78 *792 AD3d 526, 526 [1st Dept 2010].) “This calculus involves consideration of whether the impact of the penalty on the individual is so severe that it is disproportionate to the misconduct, or to the harm to the agency or the public in general.” (Matter of Kelly v Safir, 96 NY2d 32, 38 [2001].)
B. Petitioner’s Contentions of Discrimination
As explained below, it is undisputed that petitioner Castillo belongs to the class of protected individuals as a victim of domestic violence, as defined in the statute (Administrative Code § 8-107.1 [1] [b]) and that petitioner had a temporary disability caused by an injury to her hand and subsequent surgeries, also qualifying her for protection against discrimination based on her disability, as defined in the statute. (Administrative Code § 8-102 [16] [a], [b].)[17] At issue is whether petitioner satisfied her burden to show that her termination was made in bad faith, in violation of sections 8-107 (1) (a) and 8-107.1 (2) of the Administrative Code of the City of New York, and whether respondents satisfied their burden of proving undue hardship when they failed to provide petitioner with a reasonable accommodation (Administrative Code § 8-102 [18]), including whether they engaged in the “interactive process” required to assist petitioner in ascertaining a reasonable accommodation. (See Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 838 [2014].)
1. Disability Claims
As petitioner indisputably was initially absent from work because of a documented temporary disability, the placement of her in the “chronic absence category” by respondents, based on the documented temporary disability was punitive and discriminatory, and made petitioner more susceptible to inappropriate termination for any later absences. Specifically, *793 respondents’ claim of petitioner’s alleged “chronic absence,” and placement of her in such “chronic absence” category, based on 63 sick days between September 13, 2011 and February 5, 2012, was undisputably a result of petitioner’s well-documented injury/disability and two subsequent surgeries, from which petitioner had fully recovered, long before respondents’ determination to terminate her employment on August 22, 2012.[18] The use of this period (during which she was indisputably disabled), as a basis to further punish her, by her placement into a “chronic absence” category, exposed her to additional regulatory rules, discipline or termination, over and above what would be meted out as an appropriate sanction if she were to be judged solely upon the later individual absences or infractions, was discriminatory and in bad faith. As an example, respondents’ inappropriate placement of petitioner in the “chronic absence” category, due to her temporary disability, subjected her to the additional punitive requirement that she could not leave her home without permission, if she called in sick, which became an issue, as explained below. (See C. Absence Control Visits, infra.)
Furthermore, this period of time in which she was disabled, nonetheless, appears to have formed part of the basis of respondents’ decision to terminate petitioner, in violation of Administrative Code § 8-107 (1) (a), given her undisputed documented temporary disability. The inclusion of this period in the termination determination, for which respondents do not dispute petitioner’s illness/disability, shows respondents’ lack of good faith and is violative of the law, as respondents discriminated against petitioner based on her documented disability.
Although respondents argue that courts have found that absences attributed to illness or non-workplace injuries constitute a rational basis and reasonable grounds to terminate a probationary correction officer, citing Matter of Thomas v Abate (213 AD2d 251 [1st Dept 1995]) and Matter of Dolcemaschio v City of New York (180 AD2d 573 [1st Dept 1992]), in both cases petitioner had not argued a violation of HRL § 8-107 (1) (a); further, the effective date of such provision was September 16, 1991 and the absenteeism complained of therein appears to have occurred before then, and, thus not covered by such law.
*794 2. Domestic Violence Claims
Based upon the within undisputed facts and circumstances, petitioner has sufficiently established bad faith on the part of respondents, as to her domestic violence discrimination allegations. In addition to petitioner’s other claims of notice to respondents, respondents’ own exhibits reflect ample knowledge of petitioner’s domestic violence status, as conceded by respondents. Specifically, respondents’ exhibit 17 contains notes from Department of Correction’s doctor and includes the following: (1) notes for April 30, 2012 (“called sick due to c/o domestic situation at home. Refer to psychology. Domestic Violence . . . c/o limited child support”); (2) notes for May 5, 2012 (“has an order of protection”); and (3) notes for May 18, 2012 (“She reports she works w/a counselor from Safe Horizons. She says she has another appt w/ the Counselor there. She says she goes to family court. 5/21/12 re DV case: She reports hx of bullying from partner”).[19] Thus, although respondents argue that petitioner never revealed that she was a victim of domestic violence directly to her supervisors, in addition to petitioner’s other claims of notice given to respondents, it is undisputed that petitioner did reveal such fact, on several occasions, to respondent Correction’s HMD. (See verified answer, exhibit 17 [patient’s progress notes] at 2, 5-6.)
In addition to the notice plainly reflected in respondents’ own records, detailed above, petitioner asserts that she reported her domestic abuse to respondent Correction’s HMD multiple times, including but not limited to visits as early as: April 10, 2012, April 12, 2012, and April 23, 2012. Furthermore, on or about May 17, 2012, petitioner personally delivered to respondents documentation from Safe Horizon about her receipt of assistance for domestic abuse, including related court documents and information as to a crucial Family Court date, which is unrefuted by respondents, by the submission of an affidavit from someone with personal knowledge of non-receipt. (Verified petition at 5, ff 21-24; at 6, ff 26, 30; reply aff of petitioner ff 3-5.)[20] Significantly, “[f]acts appearing in the [petitioner’s] papers which the opposing party does not *795 controvert, may be deemed to be admitted.” (Kuehne & Nagel v Baiden, 36 NY2d 539, 544 [1975] [citations omitted]; Sports-Channel Assoc. v Sterling Mets, L.P., 25 AD3d 314, 315 [1st Dept 2006]; Tortorello v Carlin, 260 AD2d 201, 206 [1st Dept 1999].) The Family Court petition, attached to the Safe Horizon letter supplied by petitioner to respondents, not only provided respondents with additional notice as to her domestic violence status, but specifically contained the language: “[i]n addition, on a few occasions, he deliberately hid her badge so that she could not go to work” (verified petition at 4, ][ 13), which advised respondents that her absences were not willful.
While respondents argue that the Department of Correction Directive No. 7511 states that services and participation in CARE is confidential and attach it to their answer for the proposition that medical records are “confidential,” they fail to distinguish between medical services provided by their company doctors via the HMD and CARE (which provides confidential counseling). In fact, the Directive respondents provide as to confidentiality of counseling services only pertains to CARE. (Respondents’ exhibit 19.) Additionally, it is noted that the respondents do not specifically assert that such Health Management Division records are in fact confidential (only CARE records); nor do they submit an affidavit from someone with personal knowledge as proof of such fact, or any legal authority in support. Also, by attaching the HMD records to their answer, respondents concede that such records (not covered by Directive No. 7511), are not confidential. A “physician-patient relationship does not exist if the physician is retained solely to examine an employee on behalf of an employer. An exception applies, however, when the physician affirmatively treats or affirmatively advises the employee as to treatment and the treatment actually causes further injury.” (Lee v City of New York, 162 AD2d 34, 36-37 [2d Dept 1990] [citations omitted].) As indicated, a review of the non-confidential Health Management Division records written months prior to petitioner’s termination date of August 22, 2012 (for example, the HMD’s patient progress notes dated Apr. 30, 2012, May 5, 2012, and May 18, 2012), explicitly evidence re *796 spondent Correction’s knowledge of petitioner’s domestic violence at home. (Verified answer, exhibit 17.)[21] Thus, it is disingenuous for respondents to argue that they were not aware of petitioner’s domestic violence status, as their own Health Management Division’s notes clearly indicate that respondents were on notice.
Moreover, significantly, Warden Saunders (who is in charge of petitioner’s unit and undisputably had unfettered access to petitioner’s records but, nevertheless, signed off on petitioner’s discharge as respondent Correction’s agent) had an obligation to stop petitioner’s termination at its inception, given petitioner’s status as a domestic violence victim and the provisions of section 8-107.1 (2) of the Administrative Code. Respondents may not shield themselves by merely claiming that the top command had “no knowledge.” Further, respondents’ submission of an affirmation by counsel, lacking personal knowledge, stating that “interviews” with Warden Agro and Personnel Captain Sandra Jarrett, from petitioner’s command, confirming that “neither had knowledge that petitioner experienced any domestic violence while she was employed at the [Department of Correction],” is palpably insufficient. (Verified answer at 18, ][ 94.)[22] It is well settled that an attorney’s affirmation without personal knowledge has no probative value. (Matter of 2084-2086 BPE Assoc. v State of N.Y. Div. of Hous. & Community Renewal, 15 AD3d 288, 289 [1st Dept 2005]; see Zuckerman v City of New York, 49 NY2d 557, 563 [1980].) Thus, it is unrefuted, by any competent evidence, that respondents were repeatedly notified of petitioner’s status as a domestic violence victim, which they chose to ignore, in violation of Administrative Code § 8-107.1 (2) and, thus, acted in bad faith. As indicated previously, in addition to other indicia of notice, respondents’ own records reflect knowledge.[23]
Furthermore, respondents’ bad faith is evidenced by their failure to follow any of the procedures outlined in their very own Directive on Victims of Domestic Violence, Sex Offenses or Stalking, as required. (Respondents’ exhibit 21.) In fact, the record before this court reflects that none of the procedures outlined in respondents’ exhibit 21, the Directive on Victims of Domestic Violence, Sex Offenses or Stalking, were followed. *797 For example, petitioner was never referred by “[mjanagement, supervisors, [or] HMD ... to the EEO Office,” to engage in the “interactive process to determine a reasonable accommodation that will allow the employee to satisfy the essential functions of the position,” as required by the Directive. (Respondents’ exhibit 21 at 3, 4, 5.) Nor was she referred to respondents’ Office for Victim Services, so that it could “work in collaboration with CARE to ensure the victim is provided with resources information and support,” as directed by the Directive. (Id. at 5.) While respondents argue that petitioner’s requests for a reasonable accommodation were phrased inartfully, “a request for accommodation need not take a specific form,” so the “requests for accommodation may be in plain English, need not mention the statute or the term ‘reasonable accommodation,’ and need not be in writing.” (Phillips v City of New York, 66 AD3d at 189 and n 24.) Thus, respondents having been noticed on numerous occasions of her domestic violence situation, it was incumbent upon respondents to engage in the “interactive process” to assist petitioner, a domestic violence victim, instead of requiring her to fend for herself and subjecting her to discipline when she could not perform all aspects of the position, due to the abuse. (Respondents’ exhibit 21 at 3, 4, 5.)
Similarly, it was arbitrary and capricious, an abuse of discretion, and in bad faith to mark petitioner AWOL on the actual date of her Family Court appearance, which was a mandatory court appearance for her application for an order of protection, to assist in protecting her from her abuser. Respondents made such inappropriate designation, in spite of court documentation and a letter from Safe Horizon that they received from petitioner, confirming the mandatory Family Court appearance date, the receipt of which respondents have not refuted with competent evidence. (See Kroboth v Sexton, 160 AD2d 126, 130 [1st Dept 1990] [termination was arbitrary and capricious and made in bad faith where petitioner was marked AWOL on the very day that he sought help for substance abuse and in spite of evidence showing that the respondent was informed of the petitioner’s substance abuse problems].)
Moreover, where, as here, petitioner sought help for her domestic abuse, prior to the recommendation and issuance of her termination, and offered sufficient evidence to establish that respondents were notified on numerous occasions prior to her termination of her status as a victim of domestic violence, petitioner satisfied her burden of establishing bad faith on the *798 part of respondents. (See id. at 130 [petitioner offered sufficient evidence establishing respondent’s knowledge of substance abuse and that petitioner sought help prior to termination to establish bad faith]; cf. Matter of Flores v Doherty, 71 AD3d 405, 406 [1st Dept 2010] [no bad faith where petitioner did not seek help for substance abuse prior to the recommendation and issuance of his termination, and the employer was not aware of his substance abuse].)
Petitioner’s allegation that respondents terminated her in bad faith is further supported by four other instances for which she was marked AWOL in error, despite petitioner showing up for work; this is also not specifically refuted by respondents. In fact, petitioner’s claims are buttressed by respondents’ own documentation, which contains internal inconsistencies, so that one set of documents conflict with other of respondents’ documents, raising questions as to whether any of respondents’ documents are reliable and accurate. Upon review, respondents’ mere submission of confusing and inconsistent attendance records for petitioner from the command, without more, utterly fails to refute petitioner’s allegation that respondents marked her as AWOL, in error, on several occasions. For instance, some documentation indicates petitioner was AWOL on June 4, 2012, and others indicate she was AWOL on June 5, 2012, or both. (See verified answer, exhibit 7 at 13-17; exhibit 10 at 4; exhibits 12, 13, 15.)[24] Notably, respondents fail to refute petitioner’s claims of being marked AWOL in error on May 9, 2012; May 12, 2012; June 5, 2012; and July 10, 2012. Petitioner alleges that she reported for duty, ready and able to work for her midnight shift beginning at 11:00 p.m. on May 8, 2012, and continuing into May 9, 2012, however, she was sent home and *799 marked in error as AWOL on May 9, 2012, on account of respondent Correction’s Health Management Division’s failure to transmit required paperwork to the command. In addition, petitioner maintains that she reported for duty on May 12, 2012, for a shift beginning at 11:00 p.m. on that day, and continuing into May 13, 2012, yet respondent Correction incorrectly marked her as being AWOL on May 12, 2012. Likewise, petitioner contends that she was marked as being AWOL on June 5, 2012, and July 10, 2012, even though she was at work on those days. Respondents have failed to provide any competent evidence to refute petitioner’s allegations, such as an affidavit from petitioner’s supervisor with personal knowledge, who marked her absent on such days, after personally noting that she was not there.
It is compelling that petitioner, similar to many victims of domestic violence who “are embarrassed or . . . fear losing their jobs” (Local Law No. 1 [2001] of City of NY § 1), was reticent about informing respondents about the incidents of domestic abuse that she endured (see verified petition at 7, f 33). Yet, she ultimately overcame such fears and in fact provided respondents with multiple notifications, from as early as April 10, 2012, about her status as a victim of domestic violence {id. at 5, ff 21-23; at 6, ff 26, 30; at 6-7, f 31; at 7, f 32). Even after petitioner received a temporary protective order, which barred her abuser temporarily from the premises, which left her five children without a caretaker while she was at work,[25] she was denied a reasonable accommodation; nor was she assisted in obtaining an accommodation by Department of Correction’s EEO Office as required by respondent Correction’s own Directive (respondents’ exhibit 21), so that she could continue working. In May 2012, on her own, she made a reasonable accommodation request for a leave of absence to human resources at her command. Nevertheless, respondents denied her request, on the mere ground that she was still on probationary status, which is legally insufficient (verified petition at 7, f 35; reply affirmation of petitioner at 7, f 21).
Although respondents deny that petitioner made a request for a leave of absence on account of her status as a victim of domestic violence, respondents merely submit an affirmation by counsel making such assertion, without personal knowl *800 edge, rather than an affidavit by someone with personal knowledge to refute petitioner’s allegations. Additionally, respondents fail to refute that, on or about May 1, 2012, after respondents had been notified about petitioner’s domestic abuse, petitioner submitted a request for a change of tour on account of hardship, which respondents denied. (Verified petition at 7, 1 34.) Further, at the time that petitioner notified respondents’ agent that she had suffered injury to her back at the hands of her abuser, petitioner advised respondents’ agent, Dr. Mathur, that she had submitted a “hardship tour” request with her command, and she was refused assistance with her request for a reasonable accommodation. (Verified petition at 5, 'll 21.) Respondents do not address their failure to assist petitioner, a domestic violence victim, as required under their Directive (respondents’ exhibit 21) or indicate that they engaged in the required “interactive process” to determine a reasonable accommodation or hold a “constructive dialogue about the possibility of a reasonable accommodation.” (Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 838 n 2 [2014].)
Thus, petitioner sufficiently demonstrated ample bad faith on the part of respondents, who not only failed to provide reasonable accommodations for petitioner based upon her status as a victim of domestic violence, in violation of Administrative Code § 8-107.1 (3) (a), but also failed to provide the required services necessary to assist her to obtain such reasonable accommodations, in violation of its own Directive. (See respondents’ exhibit 21.) In fact, it appears that the only “accommodation” respondents made in response to petitioner divulging her painful secret of domestic violence, which affected her well-being and that of the five children under her care, was to take away her gun. Respondents gave petitioner none of her requested reasonable accommodations (i.e., leave of absence or change in tour of duty), but instead inappropriately marked her AWOL while she was at Family Court seeking an order of protection (despite being informed of the mandatory court date by Safe Horizon) and, incredibly, believed her abuser over petitioner, as to the August 3, 2012 incident in which the abuser answered the door to her home at 10:15 at night and told respondent Correction’s agent that petitioner was “at church,” despite it not being regular church hours, when petitioner maintained that she was in fact there.
Moreover, respondents’ decision to terminate petitioner’s employment, their failure to provide her the reasonable accom *801 modations she requested (despite abundant notice of her status as a victim of domestic violence), their failure to follow their own Directive on domestic violence victims (see respondents’ exhibit 21) and failure to engage in any “interactive process,” was arbitrary and capricious, an abuse of discretion, and made in bad faith. Significantly, respondents do not argue that it would have caused undue hardship in the conduct of their business to provide a reasonable accommodation to enable petitioner, who is a victim of domestic violence, to satisfy the essential requisites of her job. Respondents have also failed to show the unavailability of any safe and reasonable accommodation for petitioner’s status as a victim of domestic violence, but instead denied petitioner’s multiple requests, based on the legally insufficient reason that petitioner was a “probationary employee.” As indicated, probationary employees are also covered by the New York City Human Rights Law. (See Quick v Horn, 21 Misc 3d 1116[A], 2008 NY Slip Op 52078[U] [Sup Ct, NY County 2008]; Matter of Reynolds v Fraser, 5 Misc 3d 758 [Sup Ct, NY County 2004].) Consequently, respondents have utterly failed to meet their burden to prove that any proposed accommodation would place an undue hardship on their business. (See Administrative Code § 8-102 [18]; Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824 [2014]; Romanello v Intesa Sanpaolo, S.p.A., 22 NY3d 881 [2013].) Such failure by respondents buttresses petitioner’s claim of bad faith.
The court notes that the cases relied on by respondents, such as Matter of Butler v Abate (204 AD2d 171 [1st Dept 1994]), Matter of Soto v Koehler (171 AD2d 567 [1st Dept 1991]), Matter of Ferone v Koehler (160 AD2d 572 [1st Dept 1990]), Matter of Yashua Amen Shekhem El Bey v New York City Dept. of Correction (294 AD2d 164 [1st Dept 2002]), Matter of Morgan v Kerik (267 AD2d 8 [1st Dept 1999]), Matter of Kirdahy v Schembri (223 AD2d 416 [1st Dept 1996]), and Matter of Tankard v Abate (213 AD2d 320 [1st Dept 1995]), are easily distinguishable, as petitioner in the within case has undisputably shown that respondents terminated her in bad faith. In particular, none of the cases cited by respondents involve instances where the petitioner’s absences were due to domestic violence and a fear of leaving children at home with an abuser, as is the case herein.
Petitioner correctly relies on Matter of Reynolds v Fraser (5 Misc 3d 758 [Sup Ct, NY County 2004]), which, also involved the unlawful termination by the New York City Department of *802 Correction of a probationary correction officer, who was a victim of domestic violence. Here, as in Reynolds, petitioner sought assistance from Safe Horizon for her problems with domestic abuse, about which respondents had similarly been notified, and, likewise, also struggled with absenteeism, that was a byproduct of the domestic violence. (See id.) The court in Reynolds found that, notwithstanding the petitioner’s history of excessive tardiness and absenteeism, which occurred especially in the earlier part of the petitioner’s employment and prior to the petitioner’s alleged status as a victim of domestic violence, as is the case herein, the Department of Correction terminated the petitioner in bad faith, given the petitioner’s status as a victim of domestic violence at the time of her actual termination, and respondents’ awareness of such status. (See id. at 765-766.) Similarly, as explained by the Court of Appeals in Matter of McEniry v Landi (84 NY2d 554, 560 [1994]), “the inquiry must focus on petitioner’s status as of the time of actual termination and not earlier.” (Emphasis supplied.) Thus, here, respondents’ focus and use of earlier excused absences in which petitioner was undisputably disabled and protected by HRL § 8-107 (1) (a), to buttress their decision to terminate petitioner is inappropriate and in bad faith.
In light of the important public policy considerations for protecting the economic viability of domestic violence victims, and in support of their efforts to become independent from their abusers, it is paramount that individuals who are actual or perceived victims of domestic violence be protected from employment discrimination because of their status as a victim of domestic violence. (See Local Law No. 1 [2001] of City of NY §1.)
With regard to petitioner’s discrimination claim, as it has not been refuted that petitioner, a victim of domestic abuse, is considered to be a member of a protected class and, as petitioner’s status as a victim of domestic violence contributed to her absences, and given petitioner’s exceptional work record (other than the absences at issue), and respondents’ failure to follow its own procedures stated in its Directive on Victims of Domestic Violence, Sex Offenses or Stalking (respondents’ exhibit 21), respondents’ determination to terminate petitioner’s employment was made in bad faith, was arbitrary and capricious, constituted an abuse of discretion, and was disproportionate to her offense and violative of Administrative Code § 8-107.1 (2).
*803 Further, with respect to her disability discrimination claim, as it appears that respondents also discriminated and inappropriately placed petitioner in the “chronic absence” category, given her unrefuted and well-documented temporary disability at the time, and based their decision to terminate petitioner on absences which were undisputably related to a temporary disability, and used such temporary disability to subject additional requirements and sanctions, such actions are in violation of Administrative Code § 8-107 (1) (a) and were made in bad faith.
C. Absence Control Visits
Respondents’ reliance on petitioner’s alleged violation of respondents’ Directive No. 2262R on two separate occasions, which required petitioner to call Department of Correction and advise them of her plan to leave her residence prior to her departure, while on sick leave, forms an insufficient basis for termination and for the penalty imposed. As previously explained, respondents inappropriately and discriminatorily placed her in the “chronic absence” category based on a disability protected by HRL § 8-107 (1) (a). If an employee is placed in such a category, Department of Correction’s rules and procedures require that the employee is required to remain confined to his/her residence, except for limited purposes, on any day he/she calls in sick pursuant to Department of Correction Directive No. 2262R § III-E. (Verified answer, exhibit 9.) If respondents had not discriminated against petitioner by inappropriately placing her in the “chronic absence” category, these two incidents would not have been a basis for any sanctions, as she would not have been required to be confined to her home, or call in, on an ordinary sick day, in the ordinary course.
Further, the two occasions were explained by petitioner. Specifically, on one of the occasions, the August 3, 2012 absence control visit, petitioner alleges that she was home, but was not aware of the visit because she believes the monitors went to the wrong door of her two-family house and left paperwork with the wrong family. (Verified petition at 9, f 48.) According to respondents, it was petitioner’s significant other (her abuser), who answered the door at night (10:15 p.m.) and informed Captain Jelson Goyco, who performed the absence control visit, that petitioner was at church (even though it was not regular church hours). (Verified answer at 15, f 82; exhibit 12 [Investigator’s Daily Worksheet for Aug. 3, 2012 Absence Control Visit].) Significantly, respondents fail to rebut petition *804 er’s insistence that she was home or support such assertions with an affidavit from Captain Goyco, or other individual with personal knowledge. It is noted that it is not plausible for petitioner to further dispute respondents’ assertions as to the August 3, 2012 visit by providing an affidavit from petitioner’s abuser, as it would prove dangerous and is clearly not advisable.[26]
On the second absence control visit in question, conducted on June 26, 2012, petitioner explained she was not at home because she was at her uncle’s wake. (Verified answer, exhibit 10 [June 27, 2012 statement by petitioner].) Indeed, petitioner asserts that she provided the Department of Correction documentation from the funeral home to prove that she was in attendance at her uncle’s wake on June 26, 2012. (Verified petition at 9, f 46.) In spite of such documentation, petitioner was suspended by respondents for four days. (Id.) Furthermore, petitioner was further punished by being unable to attend her uncle’s funeral because she was required to report to the Department of Correction’s Health Management Division, despite her request to change her appointment date so that she would be able to attend the funeral. (Id.)[27]
D. Penalty Shocks the Conscience
Under the within undisputed facts and circumstances, the penalty imposed by respondents of dismissal of petitioner, a victim of domestic violence (of which respondents were notified on numerous occasions) and a caregiver of five children (some of whom suffer from special needs) and, given that respondents based their penalty of termination, in part, on absences attributed to her status as a domestic violence victim (including Family Court appearance on an order of protection) and on absences prior to the disclosure of her domestic violence status, which indisputably were attributed to a documented temporary disability, such actions are indeed so disproportionate to the alleged misconduct, the harm to the agency, or the general public welfare, such that a lesser penalty, other than termination, is warranted. Further, such penalty is especially shocking in that respondents were obligated to affirmatively assist their employees who were being abused, in accordance with their own policy and procedures outlined in their Direc *805 tive, which was clearly not followed. (Respondents’ exhibit 21.) To the extent that respondents have alleged any unexplained absences, or violations of rules by petitioner, respondents have not maintained that termination would nonetheless have been the appropriate penalty, absent respondents’ inappropriate and discriminatory placement of petitioner in the “chronic absence” category, based on her temporary disability, or their discriminatory conduct based on petitioner’s domestic violence status. In any event, the extreme penalty of termination would be shockingly disproportionate to any remaining alleged infractions, even if substantiated, given respondents’ bad faith and petitioner’s personal situation. (See Matter of Diefenthaler v Klein, 27 AD3d 347 [1st Dept 2006]; Matter of Lagala v New York City Police Dept., 286 AD2d 205 [1st Dept 2001], lv denied 97 NY2d 605 [2001]; Matter of Mauro v Walcott, 115 AD3d 547 [1st Dept 2014]; Matter of Brito v Walcott, 115 AD3d 544 [1st Dept 2014] .)[28]
For the foregoing reasons, the petition is granted to the extent that petitioner’s termination is annulled, petitioner is restored to employment forthwith, with full back pay and benefits and seniority as provided below, and the proceeding is remanded to respondent Department of Correction for imposition of a lesser penalty, consistent with this decision.
Accordingly, it is ordered and adjudged that the petition is granted to the extent that respondents’ decision to terminate petitioner is vacated and annulled; and it is further ordered and adjudged that respondents restore petitioner to her position as a correction officer with the New York City Department of Correction forthwith and she be reinstated with full back pay, full benefits, and seniority for the period of time she was removed from the payroll; and it is further ordered and adjudged that this proceeding is remanded to respondent Department of Correction for imposition of a lesser penalty consistent with this decision; and it is further ordered that, within 30 days of entry, petitioner shall serve upon respondents a copy of this decision and judgment with notice of entry.

. While respondents submit a mere form — without a supporting affidavit — to support their claim that the head of the unit to which petitioner disclosed her victim status had allegedly previously recommended termination, no termination in fact took place at that juncture.

. Respondents’ answer was merely signed by attorney Stephen P. Pischl, Assistant Corporation Counsel of the City of New York, not under oath, and verified by Anika Bent-Albert, Assistant General Counsel, who appears to lack personal knowledge.

. Alternatively, she argues that, at a minimum, the evidence raises a question of fact as to respondent Correction’s knowledge of petitioner’s status as a victim of domestic violence.

. For example, no affidavit has been submitted from Warden Agro and Administrative Deputy Warden Diaz disclaiming knowledge of petitioner’s status as a victim of domestic violence or from Correction Officer Quinones that she did not receive the packet, on respondents’ behalf, notifying respondents about petitioner’s domestic abuse, personally delivered to her by petitioner.

. Respondents’ HMD records indicate that on April 30, 2012 petitioner “called sick due to c/o domestic situation at home. Refer to psychology. Domestic Violence . . .c/o limited child support,” that on May 5, 2012 petitioner “has an order of protection,” and that on May 18, 2010 petitioner “reports she works w/a counselor from Safe Horizons. She says she has another appt w/ the Counselor there. She says she goes to family court. 5/21/12 re DV case: She reports hx of bullying from partner.”

. See n 5, supra.

. Respondents refer to Dr. Faouzia Barouche as a male.

. See n 5, supra.

. See n 5, supra.

. See n 5, supra.

. The court notes that prior to the final submission of this matter, the court conducted several settlement conferences, in an attempt to resolve this matter amongst the parties. At such conferences, respondents did not make an application to submit a surreply in response to petitioner’s reply papers.

. HRL § 8-107.1 (2), which covers domestic violence discrimination, provides:
“Unlawful discriminatory practices. It shall be an unlawful discriminatory practice for an employer, or an agent thereof, to refuse to hire or employ or to bar or to discharge from employment, or to discriminate against an individual in compensation or other terms, conditions, or privileges of employment because of the actual or perceived status of said individual as a victim of domestic violence, or as a victim of sex offenses or stalking.” (Emphasis supplied.)

. HRL § 8-107 (1) (a), which covers disability discrimination, provides:
“Employment. It shall be an unlawful discriminatory practice:
“(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.” (Emphasis supplied.)

. See n 13, supra for text of statute.

. See n 12, supra for text of HRL § 8-107.1 (2).

. HRL § 8-107.1 (3), which covers requirements for reasonable accommodation for domestic violence victims, provides:
“(a) Requirement to make reasonable accommodation to the needs of victims of domestic violence, sex offenses or stalking. Except as provided in paragraph (c), any person prohibited by this section 8-107.1 from discriminating on the basis of actual or perceived status as a victim of domestic violence or a victim of sex offenses or stalking shall make reasonable accommodation to enable a person who is a victim of domestic violence, or a victim of sex offenses or stalking to satisfy the essential requisites of a job provided that the status as a victim of domestic violence or a victim of sex offenses or stalking is known or should have been known by the covered entity.” (Emphasis supplied.)

. Administrative Code § 8-102 (16) (a) and (b) provide as follows:
“(a) The term ‘disability’ means any physical, medical, mental or psychological impairment, or a history or record of such impairment.
“(b) The term ‘physical, medical, mental, or psychological impairment’ means:
“(1) an impairment of any system of the body; including, but not limited to: the neurological system; the musculoskeletal system; the special sense organs and respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system; or “(2) a mental or psychological impairment.”

. Respondents claim that her disability is not a basis to shield her from placement into the “chronic absence” category according to their rules. Nonetheless, employers are required to follow the Human Rights Law.

. It appears that the illegible words are “bullying from.”

. Notwithstanding that respondents argue that they were unaware of petitioner’s court date in Family Court, petitioner specifically alleges, and proffers her own unrefuted affidavit, stating that she personally brought documents to her command, the Eric M. Taylor Center, at Rikers Island, consisting of a letter from Safe Horizon, the agency that assisted petitioner to file an application for an order of protection from her abuser, and a copy of *795 a temporary order of protection, listing the next court date. (Reply aff of petitioner at 1,1 3.) While respondents baldly assert that the package personally delivered by petitioner is not in respondents’ possession, significantly, there is no recital of any search of respondents’ files or sworn averment of non-receipt.

. See n 5, supra.

. Moreover, such affirmation by respondents’ counsel does not indicate who conducted the alleged interviews with Warden Agro or Captain Jarrett.

. See n 5, supra.

. For example, a copy of the “Charges, Specifications and Disposition” and supporting documentation, dated June 4, 2012, indicates that petitioner was AWOL on June 4, 2012. (Verified answer, exhibit 7 at 13-17.) In contrast, petitioner is documented as being AWOL on June 5, 2012, and not June 4, 2012, in the “Employee Performance Service Report,” dated June 27, 2012, which includes a list for “all entire tour AWOLs for the past three (3) years.” (Verified answer, exhibit 10 at 4.) Likewise, on the “Employee Performance Service Report,” dated August 6, 2012, petitioner is listed as being AWOL on June 5, 2012, and not June 4, 2012. (Verified answer, exhibit 12.) Additionally, in respondent Correction’s “Personnel Determination Review,” dated August 20, 2012, which lists petitioner’s attendance record since December 16, 2010, petitioner is listed as being AWOL on June 5, 2012, and not June 4, 2012. (Verified answer, exhibit 15 at 1.) Yet, according to respondents’ “Uniformed Force Attendance: N.Y.C. Department of Correction,” petitioner was AWOL on both June 4, 2012, and June 5, 2012. (Verified answer, exhibit 13.)

. Petitioner explained to Department of Correction that the NYC Administration for Children’s Services was monitoring her situation so she could not leave her children unattended.

. Moreover, attending church at 10:15 p.m. at night is more improbable than likely.

. If she had not been placed in the “chronic absence” category inappropriately, there would have been no visit to her home.

. To the extent respondents seek to terminate based on her alleged AWOL when she was at her uncle’s wake, such would be shockingly excessive. Moreover, respondents already punished petitioner with a four-day penalty and prevented her from attending her uncle’s funeral.